UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Criminal No. 24-cr-00223-CKK-1 |
| v. : | |
| : | |
| KIRK PERRY, : | |
| : | |
| Defendant. : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

From approximately August 2015 through November 2022, defendant Kirk Perry conspired with his nephew Jamarea Grant[1] to steal approximately $400,000 from the United States government. Perry was the mastermind of the scheme, and abused his position of trust as a senior director within the Office of the Assistant Secretary for Civil Rights ("OASCR") to:

- direct an OASCR contractor to hire Grant for a job for which he was not qualified;

- send Grant phony work assignments to give the illusion that Grant was performing the work for which he was being paid; and

- falsify Grant's weekly timesheets to cause OASCR to be billed for work that Grant did not actually perform.

The defendant then siphoned off a portion of the wages that were paid to Grant into his own PayPal account in the amount of almost $125,000. And the defendant did not only abuse his position to secure employment for Grant and then bill OASCR for work not actually performed—he did the same thing for his: (1) longtime partner with whom he resides and shares children; (2) cousin by marriage; and (3) personal acquaintance who he previously coached in basketball.

---

[1] Grant was indicted along with Perry, and has also pleaded guilty to Conspiracy to Commit Wire Fraud. Grant's sentencing hearing is scheduled for December 18, 2025.

The defendant's brazen conduct over a period of many years is serious and demands commensurate punishment. The government therefore recommends that the Court sentence the defendant to a within-guidelines sentence of 33-41 months of imprisonment, followed by three years of supervised release, and to include mandatory restitution in the amount of $399,319 to the victim, the United States Department of Agriculture. The government also asked the Court to impose a $399,319 criminal forfeiture money judgment in favor of the United States. Such a sentence would be sufficient but not greater than necessary to comply with the purposes of sentencing, by reflecting the seriousness of the defendant's offense, including his knowing, willful, and voluntary exploitation of his position of trust over many years, and to deter him and others from engaging in such behavior in the future.

I.      **Factual and Procedural Background**

As noted in the Statement of Offense (ECF No. 38) and Final Presentence Investigation Report ("PSR"), at all relevant times, the defendant was employed as a Supervisory Equal Opportunity Specialist who served as Program Director for the Employment Adjudication Division ("EAD") of the Office of the Assistant Secretary for Civil Rights ("OASCR") within the United States Department of Agriculture ("USDA") located in the District of Columbia. The defendant's duties included monitoring the performance of Panum Telecom LLC ("Panum"), and, later, AttainX Inc. ("AttainX"), which were contracted by OASCR to hire contract employees to perform Equal Employment Opportunity ("EEO") services on its behalf.[2] The defendant also exercised daily oversight of the contract employees and verified contract employee timesheets for payment.

---

[2] AttainX replaced Panum as the contract vendor for OASCR in March 2018. When that happened, Grant's employment with Panum rolled over to AttainX.

2

Based on his senior position at OASCR, the defendant was able to essentially direct Panum to hire certain individuals as Equal Opportunity Assistants ("EOA") under the contract with OASCR. Over time, the defendant took advantage of his leverage to direct Panum to hire not only his nephew Grant, but also his longtime partner, his cousin by marriage, and another personal acquaintance. None of those individuals had any background, education, or experience in EEO-related matters. As EOAs, those individuals were hired to provide equal opportunity review and audit services to OASCR, including reviewing, editing, and drafting reports pertaining to EEO complaints filed against USDA agencies and offices. However, thanks to the defendant, those individuals performed little to none of the work for which they were paid.

Instead, the defendant ensured that Grant and the others reported directly to him, and that he exclusively provided them with work assignments. Some weeks, the defendant did not send Grant or the others any work assignments at all. Other weeks he sent them only a small number of work assignments. But even then, the assignments that Perry sent were often bogus, and were intended merely to create the illusion that actual work was being performed. For instance, many of the work assignments that the defendant sent to Grant were reports that had already been reviewed by other EOAs or were already in final form and did not require further review. The defendant also sometimes sent the exact same reports to Grant multiple times.

In addition to "supervising" Grant and the others, the defendant also falsified the employees' weekly timesheets in which they reported their hours worked and/or number of reports reviewed. Contract employees such as Grant were required to submit those weekly timesheets to Panum and AttainX, which in turn submitted invoices to OASCR based on the work that the contract employees had performed. But, instead of submitting his own timesheets, Grant allowed

3

the defendant to submit Grant's timesheets. The defendant then falsified the number of hours Grant worked and/or the number of reports he reviewed, including by falsely reporting that Grant routinely worked in excess of 40 hours per week and worked on weekends and holidays. Indeed, thanks to Perry, Grant was consistently the highest billing EOA, thereby resulting in the greatest possible losses to the government.

And not only did the defendant prepare and submit falsified timesheets, but he then used his supervisory position within OASCR to *approve* the invoices for payment to Panum and AttainX based on the *very same timesheets* he himself had falsified and submitted. Once those invoices were approved, the government paid Panum and AttainX, and, finally, Panum and AttainX then used a portion of those funds to pay Grant and the others according to their timesheets.

As a result of the defendant's fraud, from August 2015 through November 2022 Panum and AttainX paid Grant approximately $399,319 using money obtained from the government for work that was not performed.[3] As the final stage of his scheme, the defendant needed to ensure

---

[3] The actual loss to the government is certainly greater than the $399,319 figure that was used in the plea agreement and for the purposes of calculating the defendant's sentencing guidelines range. That is because the $399,319 figure is based on what Panum and AttainX paid to Grant, and not on what the *government* paid to the contracting companies for Grant's billed hours. Put more precisely, based on the government's evidence, Panum billed the government at a premium of approximately 1.9 times of what Panum paid Grant at his hourly rate. Consequently, for the $195,480 that Panum paid to Grant, the government would have paid Panum approximately 1.9 times that amount, or $371,000. Also based on the government's evidence, AttainX billed the government at a premium of approximately 1.64 times Grant's hourly pay rate. Thus, for the $203,839 that AttainX paid to Grant, the government would have paid AttainX approximately $334,000.

Moreover, the $399,319 figure only accounts for the defendant's conduct in relation to Grant. As noted in the Statement of Offense, the defendant also arranged for the employment by Panum of at least three other personal acquaintances who billed the government for work they did not perform. Based on the government's evidence, Panum paid those other three individuals approximately $161,590 for work they did not perform.

To be clear, the government does not now contest the loss amount of $399,319 that was used to

that he also personally benefitted from the fraud being perpetrated on the government. So, the defendant set up the bank account in Grant's name into which Grant's salary was deposited. The defendant himself controlled access to the account and received the account statements. Using that access, over a period of several years the defendant transferred approximately $124,444 from Grant's bank account to a PayPal account under the defendant's control.[4]

Before he was indicted, law enforcement agents approached the defendant for voluntary, noncustodial interviews on January 8, 2021, and again on March 7, 2023. While he agreed to be interviewed, the defendant denied any involvement in a scheme to defraud the government, denied having any personal relationship or involvement with any contract employee hired to work on the OASCR contract, denied directing Panum to hire any particular contract employee, denied having any role in assigning work to or supervising any contract employee, and denied any knowledge of the tens of thousands of dollars that were transferred from those employees' bank accounts into his own PayPal account.

On May 9, 2024, the defendant and Grant were indicted with one count of Conspiracy to Commit Money, Property, and Honest Services Wire Fraud, in violation of Title 18, United States Code, Sections 1349, 1343, 1346, and four counts of Wire Fraud, in violation of Title 18, United States Code, Sections 1343, 1346. ECF No. 1. On November 27, 2024, Grant pleaded guilty

---

calculate the defendant's sentencing guidelines, nor do we seek a greater restitution or forfeiture amount. This information is provided only to show the true breadth of the defendant's scheme and the harm he caused to the government.

[4] Over a period of several months in 2015, the defendant also transferred approximately $17,125 from his former basketball player's bank account to a PayPal account under the defendant's control. The government is not aware of any evidence that the defendant siphoned money from his cousin in the same manner. As to his longtime partner, the money that the defendant helped her to fraudulently obtain from the government presumably inured at least partially to his benefit, insofar as they cohabitate and share children with one another.

under a cooperation plea agreement to Count One of the Indictment, charging Conspiracy to Commit Money, Property, and Honest Services Wire Fraud. The cooperation plea agreement was not filed under seal. On April 29, 2025, the defendant also pleaded guilty to Count One of the Indictment.

As the parties noted in the plea agreement, ECF No. 40, Conspiracy to Commit Wire Fraud carries a maximum sentence of 20 years of imprisonment; a fine of $250,000 or twice the pecuniary gain or loss of the offense, pursuant to 18 U.S.C. § 3571(b)(3), (d); a term of supervised release of not more than three years, pursuant to 18 U.S.C. § 3583(b)(2); mandatory restitution under 18 U.S.C. § 3663A; and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

## II.     U.S. Sentencing Guidelines

In the plea agreement, the parties contemplated, and the PSR writer agreed, that the defendant's offense level under the U.S. Sentencing Guidelines ("USSG") would be offense level 20 after giving 3 levels of credit for acceptance of responsibility. The relevant USSG provisions at issue here are:

| U.S.S.G. § | Description | Level |
|---|---|---|
| U.S.S.G. § 2B1.1(a)(1) | Base Offense Level | 7 |
| U.S.S.G. § 2B1.1(b)(1)(G) | Loss Greater Than $250,000 | +12 |
| U.S.S.G. § 3B1.1(c) | Organizer, Leader, Manager, or Supervisor | +2 |
| U.S.S.G. § 3B1.3 | Abuse of Position of Trust | +2 |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | -3 |
| | Total | 20 |

The PSR writer and the parties also agree that the defendant is not eligible for the zero-point offender adjustment pursuant to U.S.S.G. § 4C1.1 because he does not meet the criterion set out in U.S.S.G. § 4C1.1(a)(10), insofar as he received an aggravating role adjustment under §

6

3B1.1. The PSR writer also concluded (and the parties agree) that the defendant has a criminal history score of zero putting him in Criminal History Category I. At Criminal History Category I and a total offense level of 20, the recommended guideline imprisonment range is 33 to 41 months, with a fine range of $15,000 to $150,000. These are the guidelines as set forth in the parties' plea agreement.

### III. The 18 U.S.C. § 3553(a) Factors Support a Sentence of Incarceration

The Court must impose a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational treatment. 18 U.S.C. § 3553(a)(2). The Court also must consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the sentencing range under the guidelines, any relevant policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to the victims. 18 U.S.C. § 3553(a)(1)-(7).

*First*, as to the nature and circumstances of the offense and the need for the sentence to reflect the seriousness of the offense, a significant period of incarceration is an appropriate sentence. The defendant's participation in the fraudulent scheme was not a one-off event nor a crime of opportunity—it was a deliberate concerted offense, committed week after week after week over many years, and involving numerous other individuals. The defendant was the clear mastermind of the scheme. Without him, it would never have been possible, or even conceived of. He enlisted those closest to him—his nephew, his cousin, his longtime partner, his former basketball player—with promises of easy money with the ultimate goal of enriching himself on

7

the government's dime. And he was able to get away with his scheme for years because of his position of trust and responsibility at OASCR. In short, the defendant <u>conceived</u> of the scheme, <u>enlisted</u> others to his cause, <u>directed</u> that they be hired as contract employees, <u>installed</u> himself as their direct supervisor to ensure they did little or no actual work, <u>falsified</u> timesheets to inflate their hours and yield the greatest possible payouts from the government, <u>approved</u> the invoices that reflected those very same fraudulent timesheets, and then <u>siphoned</u> money out of the contract employees' accounts into his own. Thanks to the defendant, Grant, in particular, was paid almost $400,000 for work he did not perform, and, as discussed above, the actual loss to the government from the defendant's scheme is undoubtedly much higher. Considering this, the requested sentence would reflect the nature, circumstances, and seriousness of the defendant's conduct.

*Second*, as to the need to promote respect for the law and to deter both the defendant and others from this type of criminal conduct, the requested sentenced would also serve to deter the defendant, specifically, and other would-be fraudsters looking to make an easy buck at the expense of the United States government, generally, from perpetrating similar frauds in the future.

*Third*, regarding the defendant's history and circumstances, he deserves credit for acceptance of responsibility and admitting to his actions through a guilty plea. That said, as discussed above, the defendant initially denied any knowledge of or involvement in the scheme when he was interviewed by law enforcement, and it was not until after he was indicted, and became aware of Grant's cooperation plea agreement, that he finally agreed to plead guilty himself. Nothing in the PSR excuses the defendant's behavior or provides a reason to depart from the guidelines or impose a more lenient sentence than the one proposed. The defendant was raised in

a middle-class, two-parent household, apparently excelled in school and sports, went to college, and eventually graduated from law school and practiced law.

Given all of the above, if anything a sentence at the high end of the guidelines range (41 months) would appear to be an appropriate punishment. However, due primarily to the defendant's lack of any serious prior criminal history, and his health problems due to a recent stroke, the government is recommending a sentence of incarceration within the guidelines range (33-41 months). To be clear, the government does not believe that the defendant's health concerns are a reason to impose a sentence below the applicable guidelines range.

"Physical condition … may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an *unusual degree and distinguishes the case from the typical cases covered by the guidelines*." U.S.S.G. § 5H1.4 (emphasis added). And "[a]n *extraordinary physical impairment* may be a reason to depart downward; e.g., in the case of a *seriously infirm* defendant, home detention may be as efficient as, and less costly than, imprisonment." *Id.* (emphasis added). The defendant here is only sixty years old and the medical conditions identified in the PSR do not appear to constitute an "extraordinary physical impairment." Nor does the defendant appear to be "seriously infirm." He participated in a lengthy reverse proffer with the prosecution team in Ohio in February of this year, and just six months ago he travelled from Ohio to the District of Columbia for his plea hearing.

Defendants much older than the defendant here have been sentenced to much lengthier terms of incarceration, and any medical conditions that the defendant has can be adequately addressed during his period of incarceration. Indeed, the Bureau of Prisons ("BOP") has

numerous facilities that are equipped to handle the defendant's medical conditions. As it does for every prisoner, the Court can anticipate that BOP will determine the appropriate placement for the defendant given his sentence, age, and medical conditions. Certainly, it cannot be said that BOP has no facilities that can adequately handle the defendant's medical concerns. Moreover, the defendant's criminal activities place him within Zone D of the sentencing guidelines, and as such, the guidelines suggest that he serve at least the minimum term of imprisonment. *See* U.S.S.G. § 5C1.1(f).

*Finally*, concerning unwarranted sentencing disparities, a sentencing court "necessarily g[ives] significant weight and consideration to the need to avoid unwarranted disparities" by "correctly calculat[ing] and carefully review[ing] the Guidelines range." *Gall v. United States*, 552 U.S. 38, 54 (2007). "[I]mposing a within-guidelines sentence is the surest way to avoid unwarranted disparities." *United States v. White*, 737 F.3d 1121, 1145 (7th Cir. 2013).

### IV.     Restitution and Forfeiture

As part of the Indictment and plea agreement in this case, the defendant agreed to the entry of a forfeiture money judgment, pursuant to 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c). Based upon the facts set forth in the Statement of Offense and the PSR, the forfeiture money judgment against the defendant should be in the amount of $399,319. A proposed final order of forfeiture is attached to this memorandum.

In addition to forfeiture, the defendant also should be ordered to pay restitution in the total amount of $399,319, to be disbursed from the Court to the United States Department of Agriculture. Mandatory restitution applies in this case under 18 U.S.C. § 3663A.

**CONCLUSION**

WHEREFORE, for the foregoing reasons, the Court should sentence the defendant to a term of 33-41 months of imprisonment, followed by three years of supervised release, order restitution in the amount of $399,319, and issue a consent order of forfeiture with a money judgment in the amount of $399,319. This guidelines sentence is appropriate given all the § 3553(a) factors here. Such a sentence would be sufficient but not greater than necessary to achieve the purposes of sentencing, and would ensure that the defendant's conduct is not taken lightly.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney
for the District of Columbia

By:      /s/ Brian P. Kelly
BRIAN P. KELLY
D.C. Bar No. 983689
Assistant United States Attorney
United States Attorney's Office
District of Columbia
601 D Street NW
Washington, DC 20530
(202) 252-7503
Brian.Kelly3@usdoj.gov